**REVERSE and REMAND and Opinion Filed July 17, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-19-00206-CV

## IN THE INTEREST OF D.L.N.G., A CHILD

**On Appeal from the 305th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. JC-17-01185**

## MEMORANDUM OPINION
Before Justices Whitehill, Molberg, and Reichek
Opinion by Justice Reichek

Mother appeals the trial court's final order naming foster parents as permanent managing conservators of her son, D.L.N.G., a child of American Indian heritage, and giving her visitation as arranged and agreed by the foster parents. In three issues, Mother contends the trial court failed to comply with mandatory provisions of the federal Indian Child Welfare Act of 1978 ("ICWA"), 25 U.S.C. §§ 1901–1963, and abused its discretion in finding that the foster parents should be named managing conservator rather than D.L.N.G.'s maternal grandmother and in ordering "nonspecific" access to the child. Because we conclude the trial court failed to comply with the ICWA, we reverse the trial court's order and remand for further proceedings consistent with this opinion.

FACTUAL BACKGROUND

In October 2017, the Department of Family and Protective Services received a referral alleging neglectful supervision of three-month-old D.L.N.G. by Mother, who at the time lived with

her mother (Grandmother). The report stated that the child's home conditions were poor, with boxes stacked everywhere, nine dogs, and dog feces on the floor. The report also alleged drug use in the home.

A caseworker went to the house the next day. Mother agreed the home was "unfit" for her and her child to live in and did not want the caseworker to enter the home because of its condition. Mother agreed to drug testing. After she tested positive for marijuana, amphetamines, methamphetamines, and cocaine, the Department filed an original petition for protection of the child, for conservatorship, and for termination in suit affecting the parent-child relationship. D.L.N.G. was removed from the home and placed in foster care. Sometime after removal, the Department learned D.L.N.G. had an American Indian child status confirmed by the Hopi Tribe.[1]

A trial before the court was held one year later. Mother did not attend because she was in the hospital giving birth to a child, but she was represented by counsel. The Department was no longer seeking termination but presented the court with two non-termination options: placement with Grandmother or placement with the foster parents. Three witnesses testified—the caseworker assigned to D.L.N.G., a tribal representative, and Grandmother. Arabia Reed, the caseworker, testified the Department became aware early on that the case fell within the ICWA and had continuing communication with Tonya Monroe, the tribal representative. Mother objected to application of the ICWA to her case because a federal district judge in Texas had ruled it unconstitutional just days before.[2] The trial court responded that at the time of foster placement, the ICWA applied "[s]o we are going back to the evolution of this case."

---

[1] "Indian child" means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. 25 U.S.C.A.§ 1903(4). In its brief, the State mistakenly asserts that D.L.N.G.'s American Indian heritage was from the child's biological father, but the evidence actually showed ICWA consideration was a result of D.L.N.G.'s maternal grandfather.

[2] *See Brackeen v. Zinke*, 338 F. Supp.3d 514 (N.D. Tex. Oct. 4, 2018). This decision has been appealed to the Fifth Circuit Court of Appeals, which stayed the district court's order pending further order of the court. *Brackeen v. Bernhardt*, No. 18-11479 (5th Cir. Nov. 19, 2018).

There was little evidence adduced at trial about Mother, who Reed said had been performing her court-ordered services but had not completed them. Mother had tested positive for marijuana, but Reed did not identify a time frame. According to Reed, the Department was not considering return of D.L.N.G. to Mother. Reed agreed that it was the Department's position that "the appointment of a parent as Managing Conservator at this time would significantly impair either the physical health or emotion development" of the child and would not be in the child's best interest "at this time."[3]

The majority of the evidence focused on Grandmother as a possible placement option. The Department conducted a home study on Grandmother a month before trial and, based on the assessment, approved Grandmother for placement of D.L.N.G. The twenty-page assessment identified both strengths and weaknesses of Grandmother and her live-in boyfriend and noted that Grandmother's home, which she had recently purchased, was "very clean" and "well kept." The report also noted that Grandmother had four dogs, instead of nine. At trial, Reed said that since its approval, the Department developed "some concerns" prompted by the guardian ad litem, who had made an unannounced visit to Grandmother's home the week before and found five dogs in the house, trash bags of clothing on the porch, and cigarette butts on the ground near the porch. The Department was concerned that Grandmother "could go back to that nasty lifestyle" but did not withdraw its approval of Grandmother. Reed said there had been no problems with the foster care placement and described foster parents' interactions with D.L.N.G. as "[l]oving, caring."

Monroe, the tribal representative, testified by telephone. Again, Mother renewed her objection based on the federal district court ruling on the ICWA. The trial judge said she would "decide before making a ruling about what weight, if any, to be given to . . . her testimony or whether the ICWA standard at all should apply." The trial judge then asked Monroe her

---

[3] Father also did not attend trial, and Reed said he was not an option, citing his "extremely long criminal history."

"association with the tribe," but Monroe indicated she could not hear the question, and the trial judge moved on without obtaining an answer.

Monroe said she reviewed the home study on Grandmother and, although the tribe initially approved placement with her, changed her mind after hearing from the guardian ad litem. Monroe said the tribe objected to the dogs in the home. She explained that when D.L.N.G. was removed, there were nine dogs in the house, which was "filthy" and had "feces all over." She had received a copy of the subsequent home study and pictures, but was concerned the house was "going to be in the same condition as it was at the time of removal." She explained that although the home study showed Grandmother had four dogs, there were five dogs during the guardian ad litem visit. Grandmother explained that the dog was "visiting," but Monroe questioned whether it was in the home permanently. Monroe said she could not "put a child, a healthy child, back into the situation this child was removed from." In particular, she noted that the child was in Grandmother's home when he was removed. Monroe said the tribe believed it was in the child's best interest to remain in the current foster placement, with Mother's rights "still intact," and that any visitation and access be supervised by the foster parents or their competent designee. She acknowledged that she had not met the foster parents or seen their home.

The final witness was Grandmother, who testified about the condition of her home at the time of removal, the condition of her new home at the time of trial, and explained the circumstances of some of the causes for concern represented in the home study. She testified there was a fifth dog in the house when the guardian ad litem visited, but she was only watching the dog for a friend. As for the bags on the porch, Grandmother said she only recently moved into her house and had pulled the bags out of storage the day before the ad litem's visit. The bags were filled with clothing that she needed to go through and wash. Grandmother also said she had picked up the cigarette

–4–

butts from the yard and placed a container on the porch to discard them in the future. Grandmother said she and her boyfriend both smoke, but neither smokes in the house.

After hearing the evidence, the trial court took the case under advisement before orally finding that "custody with an Indian parent or relative would result in serious emotional or physical danger to the child" and that placement with a parent "would significantly impair the physical health or emotional development of the child." The trial court determined that placement with the foster parents was in the child's best interest. The trial court named the foster parents as permanent managing conservators and Mother as possessory conservator with access supervised by the foster parents and discharged the Department from the case. In its final order, the trial court gave Mother access to and possession of the child at times mutually agreed to in advance by the foster parents or their designees.

On appeal, Mother has brought three issues challenging the trial court's order, arguing the trial court failed to comply with the ICWA regarding notice, expert witness testimony, and placement preferences and abused its discretion in naming the foster parents, rather than Grandmother, as managing conservator and ordering only nonspecific access to the child that is dependent on the foster parents' agreement. Because it is dispositive, we begin with her complaint regarding the ICWA and, in particular, her issue regarding the lack of expert testimony.

INDIAN CHILD WELFARE ACT

Congress enacted the ICWA in 1978 to address concerns that "an alarmingly high percentage of Indian families [were being] broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies." *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 642 (2013) (quoting 25 U.S.C. § 1901(4)). The ICWA applies to all involuntary child custody proceedings in a state court, including foster care placement, when the court knows or has reason to know an Indian child is involved. 25 U.S.C.A.§ 1912(a). Foster care placement is

defined as "any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home . . . where the parent or Indian custodian cannot have the child returned upon demand, but where the parental rights have not been terminated." 25 U.S.C.A. § 1903(1)(i). There is no dispute here that D.L.N.G. qualifies as an "Indian child" under the ICWA or that the trial court was aware of that fact.

The ICWA articulates a federal policy that elevates preservation of Indian culture and communities:

> The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . .

25 U.S.C.A.§ 1902; *see Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36 (1989). Congress sought to effectuate that policy by establishing procedures and substantive standards in all state child-custody proceedings involving an Indian child. *See* 25 U.S.C.A. §§ 1901–1915; *Mississippi Band of Choctaw Indians*, 490 U.S. at 36. At issue here is the requirement that a "qualified expert witness" support the trial court's decision on foster care placement.

Under section 1912(e), a trial court may not order foster care placement unless the court determines by clear and convincing evidence, including testimony of a qualified expert witness, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. 25 U.S.C.A. § 1912(e). A qualified expert witness must be qualified to testify regarding whether the child's continued custody by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child and should be qualified to testify as to the prevailing social and cultural standards of the Indian child's tribe. 25 C.F.R. § 23.122(a). A person may be designated by the Indian child's tribe as being qualified to testify to the prevailing social and cultural standards of the Indian child's tribe. *Id.* The social

worker regularly assigned to the Indian child may not serve as a qualified expert witness in child-custody proceedings concerning the child. *Id.* § 23.122(c).

In this case, the record does not show that the State designated any expert witnesses and, other than Grandmother, called only the caseworker and tribal representative to testify. The caseworker could not serve as a qualified expert. *See id.* Monroe, the tribal representative, testified to no facts to establish herself as a qualified expert. There is no evidence of her background, education, training, experience, her position in the tribe, or even the name of the tribe itself. The State does not argue that it presented any expert witness testimony and, in fact, specifically "agrees the tribal representative did not testify regarding her qualifications" nor even testify as to what tribe she represented despite being specifically asked by the trial court. Rather, the State argues any error in failing to properly qualify Monroe, the tribal representative, was invited by Mother's objection to application of the ICWA in this case on the basis of the federal court's decision in *Brackeen.* Specifically, the State contends the objection caused the Department and the trial court "to be lax" on her qualifications as an expert and prompted all parties, including the trial court, to take her statements as tribal representative "for granted as an expert." We cannot agree.

The invited error doctrine applies to situations where a party requests the court to make a specific ruling, then complains of that ruling on appeal. *In re Dep't of Family & Protective Servs.*, 273 S.W.3d 637, 646 (Tex. 2009). Here, the trial court did not take a specific action requested by Mother; rather, when the objection was made at the beginning of trial, the trial court ruled that it would apply the ICWA and, at the conclusion of the proceeding, did so.[4] Thus, the only issue is whether the trial court correctly applied the procedural requirements of the statute. To the extent

---

[4] The trial court found that "custody with an Indian parent or relative would result in serious emotional or physical danger to the child," a finding necessary under the ICWA. In making the finding, the trial judge noted there was an "issue" as to whether the "ICWA would apply or not." But the judge said she applied the higher ICWA standard for removal from a parent or Indian relative, beyond a reasonable doubt, and Mother "can't complain if I attribute a higher standard than what the burden would otherwise be." Under the ICWA, the beyond a reasonable doubt standard applies to termination cases. *See* 25 U.S.C.A. § 1912(f). As explained earlier, the standard is clear and convincing evidence in the case of foster care placement. *Id.* § 1912(e). Under either action, however, the decision must be supported by a qualified expert. *See id.* § 1912(e), (f).

the State suggests the Department and trial court "were bound" by the district court's decision at the time the trial took place, it cites no law for such a proposition. To the contrary, decisions of federal courts, other than the United States Supreme Court, are not binding on state courts. *See Omniphone, Inc. v. Southwestern Bell Telephone Co.*, 742 S.W.2d 523, 526 n.3 (Tex. App.—Austin 1987, no writ); *Prosper Indep. Sch. Dist. v. Central Educ. Agency*, 798 S.W. 2d 661, 665 (Tex. App.—Austin 1990, writ denied) ("This court is not required to follow and enforce an order of a United States District Court.").

We conclude the trial court failed to comply with the ICWA requirement of "qualified expert testimony" before appointing the foster parents as D.L.N.G.'s managing conservators. *See S.P. v. Tex. Dep't of Family & Protective Servs.*, No. 03-17-00698-CV, 2018 WL 1220895, at *3–4 (Tex. App.—Austin March 9, 2018, no pet.) (explaining Department did not designate any experts prior to trial and did not proffer any expert-witness testimony; thus, evidence was legally insufficient to meet ICWA standard for termination of parental rights). We therefore sustain Mother's first issue as it relates to that complaint. Because of our disposition, we need not address her remaining issues. *See* TEX. R. APP. P. 47.1.

We reverse the trial court's final order in suit affecting the parent-child relationship and remand the cause for further proceedings consistent with this opinion.

/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE

190206F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF D.L.N.G., A
CHILD

No. 05-19-00206-CV

On Appeal from the 305th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. JC-17-01185.
Opinion delivered by Justice Reichek;
Justices Schenck and Osborne participating.

In accordance with this Court's opinion of this date, we **REVERSE** the trial court's final order in suit affecting the parent-child and **REMAND** this cause to the trial court for further proceedings consistent with this opinion.

Judgment entered July 17, 2019.